UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

BEVERLEY S. JOHNSON,

                Plaintiff,                CIVIL ACTION NO. 9-CV-14899

     vs.

                                 DISTRICT JUDGE JOHN CORBETT O'MEARA

COMMISSIONER OF           MAGISTRATE JUDGE MONA K. MAJZOUB
SOCIAL SECURITY,

                Defendant.
_____/

## REPORT AND RECOMMENDATION

**I.**    **RECOMMENDATION:**    This Court recommends that Plaintiff's Motion for Summary Judgment (docket nos. 12, 17) be DENIED, Defendant's Motion For Summary Judgment (docket no. 15) be GRANTED and the instant Complaint dismissed.

                                      \*\*\*

**II.**    **PROCEDURAL HISTORY:**

        Plaintiff filed an application for disability and Disability Insurance Benefits and Supplemental Security Income on March 22, 2006 alleging that she had been disabled since January 27, 2004 due to osteomyelitis, depression and hip, jaw, knee and foot problems.  (TR 65-67, 78-83, 91-91, 99).  The Social Security Administration denied benefits.  (TR 47-57, 76-77, 84-87).  Administrative Law Judge William F. Pope (ALJ) held a de novo hearing on September 23, 2008 and subsequently found that the claimant was not entitled to a period of disability or Disability Insurance Benefits or Supplemental Security Income because she was not under a disability within the meaning of the Social Security Act at any time from January 27, 2004  through the date of the

ALJ's February 27, 2009 decision.  (TR 19-34, 562).  The Appeals Council declined to review the

ALJ's decision and Plaintiff commenced the instant action for judicial review.  (TR 6-9).  The parties

filed Motions for Summary Judgment and the issue for review is whether Defendant's denial of

benefits was supported by substantial evidence on the record.

## III.   PLAINTIFF'S TESTIMONY, MEDICAL EVIDENCE AND VOCATIONAL EXPERT TESTIMONY

### A.   Plaintiff's Testimony

Plaintiff was forty-nine years old at the time of the hearing.  (TR 566).  Plaintiff has a high

school education. (TR 145).  Plaintiff last worked in January 2004.  (TR 104).  Plaintiff testified that

her past jobs have always involved standing, which she cannot do anymore.  (TR 576).  Plaintiff also

testified that she is prevented from working because she is "not released" from the doctor who

performed her jaw surgery.  (TR 574).  Plaintiff testified that she has problems walking because the

bone for her jaw operation was taken from the iliac crest of her right leg.  (TR 575).  Plaintiff

testified that her medications interfere with her thinking and she has tremors and confusion.  (TR

575-76).  She testified that pain in her jaw, face and right leg interferes with her concentration.  (TR

576).

Plaintiff suffered drop foot after having a fall a year and a half before the hearing, for which

she wore a cam walker boot for six months.  (TR 577).  Plaintiff believes she can walk a couple of

blocks.  (TR 579).  She went to the mall for approximately one hour with her daughter and walked

or stood the entire time.  (TR 579).  Plaintiff sometimes uses a walking stick.  (TR 118).  She

testified that she can sit for twenty or thirty minutes and she has to shift her right leg a lot.  (TR 579).

At the time of the hearing, Plaintiff was living alone at a friend's house to care for the friend's

animals while the friend was working out of state.  (TR 567-68).  Plaintiff has a driver's license and

2

drove approximately one and one-half hours to attend the hearing. (TR 568). Plaintiff testified that in November 2007 she rode across country with a friend. (TR 569). In June 2008 she flew to Las Vegas to stay with her mother. (TR 569). Plaintiff performs some food preparation and does laundry. (TR 113). Plaintiff reported that she makes crafts three to four times a week, she also reads, watches television and listens to music. (TR 116). If she is "real depressed" she does not want to do anything. (TR 116). Plaintiff reported that she gets along "fine" with authority figures but does not handle stress well. (TR 118).

In November 2006 Plaintiff went to the hospital for an attempted overdose of Soma medication and alcohol. (TR 584). Plaintiff testified that she last consumed alcohol in November 2006 after she was hospitalized. Plaintiff testified that she does not attend AA and did not take Antabuse, but that she just stopped drinking. (TR 569-70). Plaintiff testified that at that time she was prescribed Seroquel and Cymbalta, which she continues to take for depression. (TR 570). Plaintiff testified that she began seeing a psychiatrist once a week approximately two months before the hearing. (TR 582). The new psychiatrist refused to give a written opinion or diagnosis, allegedly because Plaintiff was a new patient. (TR 587).

On January 23, 2007 the SSA representative reported that she had a conference call with Plaintiff and Plaintiff's legal representative in which Plaintiff stated that she is not using alcohol daily but has two drinks per week and Plaintiff drives "a little, when necessary" despite taking Neurontin. (TR 120). The representative noted Plaintiff's report of having crying spells every day, sometimes three to four times per day lasting from five to thirty minutes. (TR 120).

### B. Medical Evidence

The Court has reviewed in full the records in this matter. Plaintiff reported to the hospital on January 20, 2004 for complaints of facial swelling following a tooth extraction. (TR 171, 237-

3

38).  Mark Glyman, M.D., diagnosed "submandibular abscess swelling secondary to blocked salivary gland." (TR 171, 176).  Plaintiff underwent surgery, sialodochoplasty and sialolithotomy, on the blocked salivary gland.  (TR 172).  A January 2004 chest x-ray was normal.  (TR 175).  On February 6, 2004, following some improvement then defervescence after the surgery, Plaintiff underwent a debridement, decortication and removal of a tooth.  (TR 178, 235-36).

By February 9, 2004 Plaintiff reported increased pain and swelling.  Plaintiff was admitted and put on IV antibiotics due to possible osteomyelitis and a noted history of infection problems including severe breast infection.  (TR 177-78).  A February 10, 2004 CT scan of the maxillofacial bones revealed an "ill defined lytic lesion with pathologic fracture."  (TR 184).  On February 28, 2004 Dr. Glyman performed a mandibular resection, radical nerve exploration and another tooth extraction.  (TR 195-96).  A March 2004 a pathology report on Plaintiff's tooth and mandible revealed acute and chronic osteomyelitis of the mandible.  (TR 200).  On March 18, 2004 Dr. Glyman removed hardware.  (TR 234).

Plaintiff was referred to infectious disease specialist Ronald A. Shockley, M.D., on March 22, 2004. ( TR 202-03).  Dr. Shockley noted Plaintiff's report that she was tolerating clindamycin without difficulty and with no diarrhea.  (TR 202).  The doctor recommended that Plaintiff continue clindamycin to complete a full six-week course.  (TR 203).  In June 2004 Dr. Glyman removed hardware and performed a reconstruction of the mandible with an iliac crest bone graft.  (TR 205-09).  He reported that Plaintiff  "[d]id well" and on the third day post-operation "was able to mobilize appropriately without falling with a walker."  (TR 205-07).

In April 2005 Dr. Glyman prescribed Lexapro.  (TR 232).  On April 27, 2005 Dr. Glyman removed hardware from Plaintiff's mandible and reported that the "bone graft appeared to be healing well with bony union between the proximal and distal segments."  (TR 221-22).  In May through

4

August 2005 Dr. Glyman reported that Plaintiff's was "doing well" and her surgical sites were "healing well." (TR 229-30). In November 2005 Dr. Glyman evaluated Plaintiff three times, and noted Plaintiff's report of pain on one occasion. (TR 228). Dr. Glyman completed a November 9, 2005 letter "To Whom It May Concern" and stated that Plaintiff is "totally disabled" and "[a]t this point, she cannot hold work. I will have her see me in the near future to re-evaluate her." (TR 227).

Dr. Glyman examined Plaintiff in December 2005, noted Plaintiff's complaints of pain and adjusted Plaintiff's orthotic. (TR 225). Dr. Glyman adjusted Plaintiff's mouth guard again in January 2006, performed a scar revision on February 2, 2006 and noted no more complaints of pain during weekly evaluations in February 2006. (TR 225-26). In March 2006 Dr. Glyman reported that Plaintiff was "doing well" and that the surgical site was "healing well." (TR 224). On June 23, 2006 the doctor reported that Plaintiff was "doing okay " and was on "multiple medicine (sic) for pain," was living out of town, and would "come back as necessary." (TR 224).

In August 2006 Dr. Glyman reported that Plaintiff's prognosis was "fair/guarded" and she suffered atypical pain and physical pain in the face and neck. (TR 281-88). The doctor opined that Plaintiff  can "never" lift or carry even as little as 0-5 pounds, has limitations in all other listed activities listed that involve the upper extremities, can sit two hours and stand and/or walk one hour of an eight-hour day and concluded that Plaintiff cannot perform a full time competitive job. (TR 283-86). In October 2006 Dr. Glyman again addressed a letter "To Whom It May Concern" stating that Plaintiff is "totally disabled without consideration of any past or present drug and/or alcohol use" and that such use is "not a material cause of this individual's disability." (TR 289). In December 2007 Dr. Glyman again reported that Plaintiff "is disabled and cannot function at work. She has pain in her back and has been treated using a cane." (TR 532). In May 2008 Dr. Glyman

completed another questionnaire about Plaintiff's impairments and resulting limitations, set forth in more detail below. ( TR 543-50).

On March 8, 2006 Plaintiff reported to urgent care complaining of exposure to bronchitis and a fall which resulted in right ankle pain and right foot drop. (TR 252, 260-62). An x-ray of the lumbar spine showed narrowing of the L4-5 interspace with degerative changes at L4-5 and L5-S1 facet joints. (TR 263). An MRI revealed "[s]ome degenerative disc disease in the lumbar spine" particularly at L2-3 and no significant bulging or protrusion. (TR 264-65). X-rays of the cervical spine, right hip, right lower leg and chest were negative or normal. (TR 266, 268-72). Plaintiff was prescribed a cam walker. (TR 255). By the end of March 2006, Vern Prochaska, M.D., at the Bone and Joint Institute, examined Plaintiff and reported that she was "getting some active motion back in the foot" and "will continue with the cam walker for activities to prevent catching or tripping," but can "spend more and more time out of it." (TR 253).

On March 29, 2006 Plaintiff reported to the emergency room complaining that she was unable to move her right arm. (TR 257, 275-78). The treatment provider noted that Plaintiff had "had a significant amount of alcohol to drink" and the severity of her pain was a five on a ten-scale. (TR 257). It was suggested that Plaintiff may have a palsy "secondary from being intoxicated and lying on her right side." (TR 259). Plaintiff was diagnosed with right hand weakness, neuropathy versus apraxia and ethanol intoxication and was discharged home. (TR 259).

On November 4, 2006 Plaintiff was diagnosed with right breast cellulitis. (TR 293-94). The treatment provider noted that Plaintiff had a ½ liter bottle of wine that date. (TR 294). Plaintiff was hospitalized from November 9, 2006 until November 13, 2006 after taking "a handful of Soma" during a fight with her son. (TR 296-439). Upon discharge Plaintiff was diagnosed with Major Depression, recurrent, alcohol abuse and cannabis abuse and assigned a GAF of 50. (TR 300-01).

6

Plaintiff was also taking Cymbalta at the time and was prescribed Seroquel for sleep. (TR 301). She was reported to have responded "very well" to treatment. (TR 301).

On November 14, 2006, the day after her discharge from the overdose, Plaintiff attended a Comprehensive Psychiatric Evaluation with David A. Steiner, M.D., which had been scheduled prior to the hospitalization. (TR 440-43). Dr. Steiner noted that Plaintiff "actually requested to be discharged yesterday, so she can make this appointment." (TR 440). Dr. Steiner noted Plaintiff's report that she was bipolar beginning in her childhood, that she has obsessive-compulsive disorder, that she has infrequent panic attacks and poor concentration due to rushing thoughts, she hears voices telling her to turn right or left and she sees fumes when she closes her eyes. (TR 440). The doctor reported that Plaintiff was very restless, had trouble sitting still in her chair, was oriented times five, had 3/3 immediate recall and 3/3 recent recall, speech was pressured, and insight and judgment were fair. (TR 442). The doctor diagnosed her with bipolar manic with rapid cycling, obsessive-compulsive disorder and alcohol dependency and assigned a GAF of 35. (TR 442). He recommended a payee for benefits due to her history of alcohol dependence. (TR 442).

In November 2006 examiner Mae Jean Englee, M.D., diagnosed Plaintiff with right foot drop, bipolar disorder with depression, left mandible deformity with S/P osteomyelitis, tobacco abuse, history of alcohol abuse recently sober and history of chronic bronchitis. (TR 447-48).

On January 5, 2007 Plaintiff underwent a psychiatric medical assessment with Gregory E. Smith, M.D. (TR 449- 51). The doctor noted Plaintiff's self-report that she has a history of bipolar disorder, her last alcohol use was January 4, 2007, she uses cannabis about once per week and she has tried methamphetamine, but had not used any in the past two years or so. (TR 450). The doctor reported that Plaintiff was oriented times four, somewhat hyper-verbal, her mood was reported as depressed and her insight and judgment were fair. (TR 450). The doctor diagnosed Bipolar

Disorder Type I- depressed (296.5), alcohol dependence (305.00) and cannabis abuse (305.20) and assigned a GAF of 55. (TR 450). The doctor recommended increasing her Seroquel. (TR 450).

Plaintiff treated with nurse C. Luis McTier at Margaret J. Weston Community Health Center. (TR 455-63, 509- 20, 551-52, 569). By May 2007 it was reported Plaintiff was doing better, her sleep was improved, her breast cellulitis was healing and she had not renewed her Cymbalta or neurontin. (TR 455, 510). In September and October 2007 Plaintiff underwent a trigger point injection in her back for upper back pain. (TR 509, 531). In February 2008 the treatment provider reported that Plaintiff's bipolar medications were doing well and Plaintiff reported pain in the right side, neck and shoulder. (TR 530). In July 2008 it was noted that Plaintiff's bronchitis was being re-checked, Plaintiff had requested B-12 and Plaintiff's lung function had improved. (TR 551).

Psychological consultant Edward D. Waller, Ph.D., completed a Psychiatric Review Technique dated July 17, 2007 simply referring to a PRT dated January 31, 2007 for documentation of mental impairments through July 17, 2007, noting treatment for bipolar disorder and ongoing alcohol dependence. (TR 466-78). The January 31, 2007 PRT was completed by psychological consultant Kevin W. Wing who noted that Plaintiff was undergoing treatment for bipolar I, noted ongoing alcohol dependence and concluded that Plaintiff has moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning and marked difficulties in maintaining concentration, persistence or pace and has had one or two episodes of decompensation. (TR 486-99).

### C.    Vocational Expert

The Vocational Expert (VE) testified that Plaintiff's past work as a vending machine attendant was light and unskilled in the Dictionary of Occupational Titles (DOT) but typically medium and semi-skilled as it is performed. (TR 595) . Plaintiff's past work as a delivery driver

8

was medium and semi-skilled and as a blackjack dealer or gambling dealer was light and skilled. (TR 595).  The ALJ asked the VE to consider an individual with Plaintiff's age, education and past work experience, limited to performing only simple, routine tasks in a supervised environment, no required interaction with the public or team-type interaction with co-workers, no lifting or carrying over twenty pounds occasionally and ten pounds frequently, no standing and/or walking over four hours in an eight-hour workday, no more than occasional use of foot pedals or other controls with the right lower extremity, and who should avoid hazards such as unprotected heights, vibration, and dangerous machinery.  (TR 596).

The VE testified that such an individual could not perform Plaintiff's past relevant work due to the limitation to simple, routine work. (TR 596).  The VE testified that there are other jobs which such an individual could perform including light unskilled work in reduced numbers due to the maximum standing capacity which was effectively a sit/stand variation. (TR 597).  The jobs include small product assemblers (approximately 42,000 nationally or 550 statewide), product packers and sorters (approx. 21,000 nationally or 250 statewide), and process machine tenders and operators (approx. 89,000 nationally or 875 statewide).  (TR 597).  The VE confirmed that her testimony did not conflict with the DOT and pointed out that the DOT "does not specifically address variation in modified light work activity that is sit/stand."  (TR 598).

The VE also testified that if the individual, in addition to the aforementioned limitations, could not maintain attention and concentration for "20 to 30 minutes at a time at multiple intervals throughout the day it would likely preclude the expected performance of the job in a dependable, reliable manner."  (TR 604).  The VE also testified that three absences per month would be work-preclusive.  (TR 604).

## IV.    ADMINISTRATIVE LAW JUDGE'S DETERMINATION

9

The ALJ found that although Plaintiff meets the insured status requirements through September 30, 2009, had not engaged in substantial gainful activity since January 27, 2004, the alleged onset date, and suffers from residuals of left mandible surgery, residuals of right foot injury, bipolar disorder and anxiety, she does not have an impairment or combination of impairments that meets or equals the Listing of Impairments. (TR 24). The ALJ found that Plaintiff had the residual functional capacity to perform a limited range of light exertional work. (TR 25). The ALJ found that Plaintiff is not able to perform her past relevant work yet she is able to perform a significant number of jobs in the economy and therefore she is not suffering from a disability under the Social Security Act. (TR 32-34).

## V.   LAW AND ANALYSIS

### A.   Standard of Review

Pursuant to 42 U.S.C. § 405(g), this Court has jurisdiction to review the Commissioner's final decisions. Judicial review of the Commissioner's decisions is limited to determining whether his findings are supported by substantial evidence and whether he employed the proper legal standards. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Walters v. Comm'r*, 127 F.3d 525, 528 (6th Cir. 1997). Substantial evidence is more than a scintilla but less than a preponderance; it is "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Richardson*, 402 U.S. at 401 (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *Walters*, 127 F.3d at 528. It is not the function of this Court to try cases *de novo*, resolve conflicts in the evidence or decide questions of credibility. *See Brainard v. Sec'y of Health and Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989); *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

In determining the existence of substantial evidence, the court must examine the administrative record as a whole. *See Kirk v. Sec'y of Health and Human Servs.*, 667 F.2d 524, 536

10

(6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983). If the Commissioner's decision is supported by substantial evidence, it must be affirmed, even if the reviewing court would decide the matter differently, *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983), and even if substantial evidence also supports the opposite conclusion. *See Her v. Comm'r*, 203 F.3d 388, 389-90 (6th Cir. 1999); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes that there is a zone of choice within which the decisionmakers can go either way, without interference by the courts").

### B.      Framework for Social Security Determinations

Plaintiff's Social Security disability determination was made in accordance with a five step sequential analysis. In the first four steps, Plaintiff was required to show that:

(1)      she was not presently engaged in substantial gainful employment; and

(2)      she suffered from a severe impairment; and

(3)      the impairment met or was medically equal to a "listed impairment;" or

(4)      she did not have the residual functional capacity to perform her relevant past work.

*See* 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f). If Plaintiff's impairments prevented her from doing her past work, the Commissioner, at step five, would consider Plaintiff's RFC, age, education and past work experience to determine if she could perform other work. If she could not, she would be deemed disabled. *See id.* at §§ 404.1520(g), 416.920(g). The Commissioner has the burden of proof only on "the fifth step, proving that there is work available in the economy that the claimant can perform." *Her*, 203 F.3d at 391. To meet this burden, the Commissioner must make a finding "supported by substantial evidence that [the claimant] has the vocational qualifications to perform specific jobs." *Varley v. Sec'y of Health and Human Servs.,* 820 F.2d 777, 779 (6th Cir. 1987). This "substantial evidence" may be in the form of vocational expert testimony in response to a

11

hypothetical question, "but only 'if the question accurately portrays [the claimant's] individual physical and mental impairments.'" *Id.* (citations omitted).

Plaintiff argues that the ALJ failed to properly weigh the medical opinions, failed to properly evaluate Plaintiff's credibility, erred in relying on the VE's testimony at step five because the underlying RFC did not contain all of Plaintiff's limitations and finally, argued that Plaintiff should have been found disabled based upon the grid.  (Docket no. 12-1).

C.    **Analysis:**

a.    **Whether the ALJ Properly Explained the Weight Assigned to the Medical Opinions**

Plaintiff argues that the ALJ failed to properly weigh the opinions of Dr. Glyman, Dr. Schlueter and Nurse McTier.  (Docket no. 12-1, p. 14).  It is well settled that the opinions and diagnoses of treating physicians are generally accorded substantial deference.  Under 20 C.F.R. sections 404.1527(d)(2) and 416.927(d)(2) the ALJ must give a treating physician's opinion controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record.  The Sixth Circuit has stated that "[i]n general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once."  *Walters*, 127 F.3d at 529-30. Dispositive administrative findings relating to the determination of a disability and Plaintiff's RFC are issues reserved to the Commissioner.  *See* 20 C.F.R. §§ 404.1527(e), 416.927(e).  The ALJ "is not required to accept a treating physician's conclusory opinion on the ultimate issue of disability." *Maple v. Comm'r of Soc. Sec.*, 14 Fed. Appx. 525, 536 (6th Cir. 2001); *see also* 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1).  The ALJ is required, however, to give the reasons for the weight he assigned to the treating physician's opinion.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).

12

Despite Plaintiff's argument to the contrary, the ALJ gave reasons for failing to adopt the severe restrictions set forth by the physicians and the nurse and the ALJ's findings are supported by substantial evidence.  The ALJ properly concluded that he is not required to adopt conclusive opinions that Plaintiff is "disabled" or unable to work, yet the ALJ also considered whether the opinions are supported by the evidence of record.

Plaintiff's argument provides specific cites to only Dr. Glyman's May 19, 2008 Multiple Impairment Questionnaire, a Psychiatric/Psychological Impairment Questionnaire completed by C. Luis McTier, nurse and signed by Eric Schlueter, M.D. dated April 1, 2008 and a Multiple Impairment Questionnaire bearing the name of C. Luis McTier dated September 28, 2007.  The ALJ's decision discusses multiple opinions by Dr. Glyman, as well as Nurse McTier's and Dr. Schlueter's opinions and the ALJ gave specific reasons for discounting the severe limitations and/or conclusions of disability set forth in each. (TR 32).

### 1.    Nurse McTier

First, with respect to the record signed solely by C. Luis McTier, as discussed at the hearing and set forth in the pleadings and medical records, C. Luis McTier is a nurse (FNP, family nurse practitioner).  (TR 533).  There is no evidence to the contrary.   Defendant correctly argues that Nurse McTier is not an "acceptable medical source" as defined in the regulations.  *See* 20 C.F.R. §§ 404.1513(a), (c), 416.913(a), (c) (acceptable medical sources include licensed physicians, licensed or certified psychologist, licensed optometrists, licensed podiatrists and qualified speech-language pathologists); 20 C.F.R. §§ 404.1527 (a)(2), 416.927(a)(2) ("Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of your impairment(s), including your symptoms, diagnosis and prognosis, what you can still do despite impairment(s), and your physical or mental

13

restrictions."); 20 C.F.R. §§ 404.1502, 416.902 (only "acceptable medical sources" can be considered treating sources whose opinions may be entitled to controlling weight).

A nurse practitioner is not an "acceptable medical source." SSR 06-03p at *2. However, all relevant evidence must be considered and SSR 06-03p states that "[o]pinions from these medical sources, who are not technically deemed 'acceptable medical sources' under our rules, are important and should be evaluated on key issues such as impairment severity and functional effects, along with the other relevant evidence in the file." SSR 06-03p at *3. SSR 06-03p further provides that "[t]he evaluation of an opinion from a medical source who is not an 'acceptable medical source' depends on the particular facts in each case."

In this instance, the ALJ correctly recognized that there is a treating history with Nurse McTier, yet properly noted that Nurse McTier is not a specialist in orthopedic injury, bone injury, or psychiatric disorders. (TR 31, 32). Despite the factors cited by Nurse McTier for Plaintiff's pain and limitations, such as a pinched nerve, degenerative joint disease, neuropathic pain, and radiculopathy, the ALJ found that these diagnoses and/or the resulting severity of pain or limitations are "not consistent with the lack of abnormalities on laboratory findings." (TR 32). As the ALJ pointed out, lumbar x-rays and an MRI were negative except for showing mild degenerative joint disease and degenerative changes at L4-5 and L5-S1 and no significant bulging or protrusion. (TR 24, 263-65). The ALJ also pointed out that a March 2006 x-ray of the cervical spine was negative, as were x-rays of the right hip and lower leg. (TR 24, 266, 268-72). The record does not contain objective medical evidence of radiculopathy.

With respect to all of these opinions, the ALJ also examined Plaintiff's activities of daily living and found that the opinions that Plaintiff is disabled and the severity of the limitations are incompatible with the wide variety of activities of daily living in which Plaintiff engages. (TR 32).

14

On a basic level, Plaintiff does not have trouble with personal hygiene or personal care tasks, she is able to cook and prepare meals for one to two hours per day, she engages in crafts, and has traveled fairly extensively during the relevant period, including a trip to England and a cross-country trip with a friend. (TR 32, 113-16, 509, 568-69). Plaintiff takes care of her friends' animals and lives on her own. The ALJ's decision identifies and the record contains substantial evidence inconsistent with Nurse McTier's opinion including her conclusion that Plaintiff cannot work and the severe sitting, standing and walking limitations. The ALJ gave good reasons for discounting McTier's opinion, which are supported by substantial evidence in the record.

### 2.    Dr. Schlueter

Dr. Schlueter's name appears on a Psychiatric/Psychological Impairment Questionnaire dated April 1, 2008. (TR 533-40). Nurse McTier's name and identifying information also appear on the questionnaire, sharing the signature block on the final page. (TR 540). As the ALJ points out, there is no evidence that Dr. Schlueter is a specialist in psychiatric disorders. (TR 32). As Defendant points out, the record does not show that Dr. Schlueter examined *or* treated Plaintiff. (Docket no. 15 p.14). Plaintiff does not refute Defendant's allegation and states that "while it is unclear whether Dr. Schlueter treated Ms. Johnson, the ALJ treated the opinion as one of a treating source. The Commissioner cannot now make post-hoc rationalizations." (Docket no. 17).

Neither Defendant nor this Court is making post-hoc rationalizations, but merely pointing out that the ALJ's reasoning for failing to give controlling weight to this opinion is supported by substantial evidence, including the lack of examining or other objective medical evidence supporting Dr. Schlueter's opinion. The ALJ also pointed out that Dr. Schlueter's opinion is not consistent with findings that Plaintiff "improved with proper treatment and was doing well on medications." (TR 32).

15

The ALJ cited several instances where Plaintiff reported improvement with medication.  As the ALJ pointed out, in September 2007 Plaintiff denied having any complaints or distress and it was reported that Plaintiff was "doing better" and had "just returned from England." (TR 509).  The ALJ also relied on records in February 2008, wherein the treatment provider reported that Plaintiff's "bipolar meds [were] doing well."  (TR 530).  Plaintiff testified that she stopped drinking after she was prescribed Seroquel and Cymbalta.  (TR 570).  As the ALJ concluded, the "evidence demonstrates that her bipolar disorder and anxiety are effectively treated and controlled with medication" and "her alcohol abuse is in partial remission."[1]  (TR 29).  As set forth above, the ALJ also noted that the extent of Plaintiff's daily activities was inconsistent with the severity of Dr. Schlueter's opinion.  The ALJ gave good reasons supported by substantial evidence for the weight assigned to Dr. Schlueter's opinion.

### 3.      Dr. Glyman

An ALJ does not err in "discounting the inconsistent and unsupported portions of" the treating physician's medical source statement.  *See Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001).  In *Hogan*, the ALJ's properly discounted the physician's opinion where the ALJ found that the limitations "stand alone," were never mentioned in the doctor's numerous treatment records and were not "supported by any objective testing or reasoning which would indicate why the claimant's functioning need be so restricted."  *Id*.  The *Hogan* court also noted the ALJ's observation that

---

[1] With respect to the diagnosis of bipolar disorder, it is worth noting that the ALJ correctly pointed out at the hearing that Plaintiff reported to Dr. Steiner a diagnosis of bipolar disorder on November 14, 2006 and that the record contains Plaintiff's report of bipolar disorder to each examiner but the source and/or circumstances of the original diagnosis are unclear.  (TR 583-86).  The November 13, 2006 hospital records from the previous day and following a multi-day hospital stay do not show a diagnosis of bipolar disorder.  The hospital diagnosed major depression recurrent, alcohol abuse, cannabis abuse and dependent traits.  (TR 300-01).  Plaintiff also reported to Dr. Smith that she has a history of bipolar disorder.  (TR 449-51).

16

claimant's condition was repeatedly described as "mild" and records from other physicians indicated that "her condition was being controlled by medication" and the "weight of the medical evidence was more in keeping with the restrictions described by the consulting physician." *Id.*

Similar to *Hogan*, the ALJ pointed out that Dr. Glyman's records repeatedly pointed out that Plaintiff was doing well post-operatively. (TR 532). The ALJ specifically cited Dr. Glyman's November 9, 2005 opinion that Plaintiff was totally disabled and could not work. (TR 227). Dr. Glyman's examination notes contained no such severe limitations. Dr. Glyman reported residual pain, though not noted to be severe, and a generally good postoperative outcome, including notes that Plaintiff reported that she was doing well. (TR 27, 228-30). The ALJ also cited Dr. Glyman's opinions on questionnaires dated August 28, 2006 and May 19, 2008 and his opinion of October 13, 2006, all effectively opining that Plaintiff was totally disabled. As set forth above, the ALJ did not err in failing to adopt Dr. Glyman's conclusory opinions that the claimant is disabled.

Plaintiff had pain which was addressed with pain medication. (TR 532). Notes for a follow-up examination in June 2006 showed that Plaintiff reported that she was "doing well." (TR 532). The ALJ pointed out that Dr. Glyman is not a specialist in orthopedic injury or bone injury, despite assigning severe limitations on Plaintiff's ability to sit, stand, walk and use her upper extremities and opining that she is disabled from work. Dr. Glyman is an M.D. and D.D.S. who performed Plaintiff's mandible surgery and follow-up treatment. In December 2007 Dr. Glyman opined that Plaintiff "is disabled" and reported that Plaintiff has "pain in her back and has been treated using a cane." (TR 532). There are no accompanying objective observations and the statement appears to be based on Plaintiff's subjective complaints with no evidence in the record that Dr. Glyman examined or was treating Plaintiff for back pain or that he or anyone else prescribed her use of a

17

cane for ambulation.  (TR 532).  The doctor noted some swelling in the right submandibular triangle and stated that he would "place her on some other treatments for her sialoadenitis."  (TR 532).

In the May 2008 Multiple Impairment Questionnaire Dr. Glyman listed Plaintiff's diagnoses as atypical facial pain, osteomyelitis and facial fracture and based his diagnoses on  a "lab bacterial test" and the clinical findings of the mandible resection surgery and "IV antibiotics."  (TR 543).  Dr. Glyman opined that Plaintiff has daily pain, with both pain and fatigue estimated at a nine on a ten-scale.  (TR 545).  He opined that she can sit and stand and/or walk for up to one hour per day and may never lift any weight.  (TR 545-46).  Much of the remainder of the form is incomplete, including limitations on using the upper extremities and hands, no medications or corresponding side-effects are identified, and no treatments or complications are listed.  (TR 546-47).  The doctor again concludes that Plaintiff cannot perform a full time competitive job, she experiences constant interfering symptoms, and she is incapable of even "low" work stress.  (TR 548).  She may engage in no pushing, pulling, kneeling, bending or stooping.  (TR 549).  The doctor also notes that she has "psychological limitations," which are otherwise undefined and not addressed in the questionnaire. (TR 549).

As the ALJ has pointed out, Dr. Glyman's examination notes and objective medical evidence from other sources, including x-rays and MRI's are simply not consistent with the severity of Dr. Glyman's opinions in the May 2008 questionnaire and his pervasive conclusion that Plaintiff is "disabled."  A November 2006 state agency physical examination showed that Plaintiff's gait was intact, posture and station were normal, Romberg was negative and Plaintiff was not using a mobility aid.  (TR 447).  She had only mildly reduced left and right rotation of the head and neck. (TR 447).

18

As set forth above, the ALJ also explained how the severity of Dr. Glyman's opinions was inconsistent with the extent of Plaintiff's daily activities. While the history of osteomyelitis and bacteria testing support the doctor's conclusion that Plaintiff is prone to infections, there is no explanation for the severe restrictions on walking, sitting, standing and lifting. (TR 549). The limitations set forth by Dr. Glyman are inconsistent with Plaintiff's own testimony and reports that she can engage in certain activities, such as caring for animals, shopping, cooking, going to the mall and driving for one to two hours.

The ALJ explained where the opinions were not supported by medically accepted clinical and laboratory techniques and were inconsistent with the evidence of record and did not err in failing to adopt these opinions and their ultimate conclusion of disability. The ALJ's findings on these issues are supported by substantial evidence.

**b.     Whether The ALJ's Credibility Determination Is Supported By Substantial Evidence**

Plaintiff argues that the ALJ failed to properly evaluate here credibility where the ALJ allegedly relied solely upon Plaintiff's daily activities and the ALJ's "lay interpretation of the record" to find that the severity of Plaintiff's limitations and symptoms was not credible. (Docket no. 12-1 p.18). Plaintiff predominately focuses on the severity of her pain complaints and argues that the ALJ mischaracterized her daily activities. "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Walters,* 127 F.3d at 531. Credibility assessments are not insulated from judicial review. Despite deference due, such a determination must nevertheless be supported by substantial evidence. *See id.*

An ALJ's credibility determination must contain "specific reasons . . . supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to

19

any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p. Furthermore, to the extent that the ALJ found that Plaintiff's statements are not substantiated by the objective medical evidence in the record, the Regulations explicitly provide that "we will not reject your statements about the intensity and persistence of your pain or other symptoms or about the effect your symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2). In addition to objective medical evidence, the ALJ must consider all the evidence of record in making his credibility determination. *See* 20 C.F.R. §§ 404.1529(c)(2), (3), 416.929(c)(2), (3); *see also Felisky v. Bowen*, 35 F.3d 1027, 1039-40 (6th Cir. 1994).

The ALJ initially looked at the objective medical evidence. Examination in November 2006 showed that Plaintiff had full range of motion and normal rotation of the spine, ribs and pelvis and negative straight leg raising. (TR 447). Sensation was "[n]ormal to touch, pinprick and vibration." (TR 447). Plaintiff had only "mildly reduced" leftward and rightward rotation of the head and neck. (TR 447). The examining physician, Mae Jean Englee, M.D., concluded that Plaintiff had a mild level foot drop "but can do well with a 90 degree splint" and that as far as "her left mandible deformity it can present some problem with eating or speech" but Plaintiff did well during the examination, the doctor was able to understand her and "she did not seem to be in pain." (TR 448). As set forth above, x-rays and an MRI showed some degenerative changes in the lumbar spine but all others were negative or normal.

Beyond the objective medical evidence, the ALJ is directed to consider Plaintiff's activities of daily living, among other factors, in considering the severity of Plaintiff's pain and the ALJ did so. *See* 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3). Contrary to Plaintiff's argument, the ALJ's characterization of Plaintiff's activities is supported by the record. Plaintiff reported that she cooks

20

for approximately one to two hours per day, she performs personal hygiene and care tasks without assistance or reminders, she does laundry, takes some short walks, is able to shop once a week for approximately two hours and is able to make crafts.  (TR 113-16).  Plaintiff reported travel to England (the travel time during which she presumably sat or stood) and a car trip across country, albeit as a passenger, during the relevant period.  (TR 509, 569).  Plaintiff was able to drive herself one and one-half hours to attend the hearing. (TR 26, 568).  The record also shows that Plaintiff is able to take care of animals while her friend is away and drive herself to medical appointments.  (TR 567, 600).

Despite Plaintiff's allegations, the ALJ did not limit his credibility determination to simply considering Plaintiff's activities.  The ALJ also considered Plaintiff's treatment, including the fact that she no longer used the cam walker boot for her foot drop.  (TR 30).  This is consistent with evidence of record from November 2006 showing that Plaintiff has a normal gait for which she did not use a mobility aid.  (TR 30, 447).  The ALJ also noted that there is no evidence of record showing lower extremity instability.  (TR 30).  The ALJ noted that treatment records show complaints of pain, but also reported that Plaintiff was "doing well" post-operatively.  The ALJ considered Plaintiff's medication and noted Plaintiff's reports regarding their effectiveness.  (TR 455, 509, 510, 530, 570).  Plaintiff's testimony that the medication makes her tired is not supported anywhere else in the record; there is little mention of side-effects.  Dr. Glyman recorded no side-effects from medication on the most recent questionnaire and Dr. Shockley specifically noted that Plaintiff was able to tolerate without difficulty the antibiotic she took for her osteomyelitis.  (TR 202, 547).  The ALJ properly explained his credibility determination and it is supported by substantial evidence in the record.

c.    Whether the ALJ's RFC Is Supported By Substantial Evidence And Whether the ALJ
Properly Relied On The VE's Testimony At Step Five.

In a hypothetical question posed to the VE, an ALJ is required to incorporate only those limitations which he finds credible and supported by the record and the ALJ did so.  *See Casey v. Sec'y of Health and Human Servs.,* 987 F.2d 1230, 1235 (6th Cir. 1993).  The Sixth Circuit has held that hypothetical questions to experts are not required to include lists of claimant's medical impairments. *Webb v. Commissioner*, 368 F.3d 629, 633 (6th Cir. 2004).  As discussed above, the ALJ did not adopt the severe limitations and conclusions of disability set forth by Dr. Glyman and Dr. Schlueter.  (TR 548, 536).

The ALJ found that Plaintiff has the RFC to perform light exertional work[2] limited to simple, routine work in a supervised environment with no required interaction with the public or "team" type interaction with co-workers, no standing and/or walking more than four hours in an eight-hour workday, no more than occasional operation of foot pedals or controls with the right lower extremity and no exposure to hazards such as unprotected heights, vibration or dangerous machinery. (TR 25).

The ALJ's RFC for a limited range of light exertional work is consistent with both Plaintiff's report that she can lift about fifteen to twenty pounds and Nurse McTier's opinion that Plaintiff can lift and carry up to twenty pounds occasionally and up to ten pounds frequently.  (TR 117, 524). State agency medical consultant Joyce Lewis, M.D., completed a Physical Residual Capacity Assessment dated January 3, 2007 and concluded that Plaintiff can lift and/or carry up to fifty pounds occasionally and twenty-five pounds frequently, stand and/or walk about six hours of an eight-hour workday, sit about six hours of an eight-hour workday and is limited in the right lower extremity to only occasional operation of foot controls.   (TR 500-07).  The ALJ did not find

_____

[2] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  20 C.F.R. § 404.1567(b).

credible Plaintiff's complaints of the severity of her lower extremity symptoms and limitations on the ability to walk and/or stand and did not preclude walking and/or standing in the RFC or the hypothetical question. The ALJ did, however, find severe limitations in walking and/or standing, and the RFC limits Plaintiff to performing the same for no more than four hours of an eight-hour workday. (TR 25). The limitations to simple, routine work, in a supervised environment with no "team"-type interaction with co-workers or required interaction with the public are consistent with the ALJ's determinations regarding Plaintiff's mental impairments[3].

The ALJ presented all of the limitations of the RFC in his hypothetical question to the VE and the VE testified that such an individual would not be capable of performing Plaintiff's prior work, but that there are jobs available for a person with these limitations. The ALJ's decision that Plaintiff retained the RFC for a restricted range of light work is supported by substantial evidence and the ALJ properly relied on the VE's testimony to find that there are significant numbers of jobs available which Plaintiff can perform.

Plaintiff's final argument is that she should have been found disabled pursuant to the Medical-Vocational Guidelines (the "Grid") Rule 201.14. *See* 20 C.F.R. Subpart P, Appendix II, Rule 201.14. Plaintiff argues that she was "restricted to no more than sedentary work and the VE testified she had no transferable skills" and that the ALJ should have considered whether to apply Rule 201.14 non-mechanically where Plaintiff was within two months of her 50th birthday at the time of the ALJ's decision. (Docket no. 12-1 p. 20). In fact, the ALJ determined that Plaintiff can perform a limited range of light, not sedentary work. Plaintiff revived this argument in her reply

---

[3] Pursuant to 20 C.F.R. §§ 404.1520a, 416.920a, the ALJ rated Plaintiff's mental limitations in four functional areas. The ALJ concluded that Plaintiff has moderate restrictions in activities of daily living, moderate difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace on complex tasks and detailed instructions with no evidence of episodes of decompensation of extended duration. (TR 30).

23

brief by arguing that because Plaintiff is significantly restricted in her walking and standing, she cannot perform substantially all of the requirements of light work.  (Docket no. 17).

The Court does not find persuasive Plaintiff's argument that she is effectively limited to sedentary work because of her walking/standing limitation.  The provision to which Plaintiff cites addresses those jobs in which the weight lifted is very little and would otherwise be classified as sedentary, yet the job requires a "good deal of walking or standing" and is therefore classified as light exertion.  Plaintiff points out that SSR 83-10 states that "the full range of light work requires standing or walking, off and on, for a total of approximately 6 hours of an 8-hour workday."  SSR 83-10.  The ALJ did not conclude that Plaintiff can perform the full range of light work.  The ALJ used the Grid as a framework yet properly relied on the VE to determine how Plaintiff's additional limitations, including the standing and walking limitations, further eroded the light job base.  The Court finds consistent with cases in this circuit that "the ALJ was entitled to rely on the testimony of the vocational expert in reaching his decision."  *Wright v. Massanari*, 321 F.3d 611, 616 (6th Cir. 2003); *Braden v. Sec'ty of Health & Human Servs.*, 918 F.2d 178 (6th Cir. 1990) (The ALJ correctly conducted an "independent inquiry into the jobs available in the national economy to someone with appellant's impairments.").  The ALJ's decision at step five is based on substantial evidence and was not the result of procedural error.

## VI.    CONCLUSION

The ALJ's decision was within the range of discretion allowed by law and there is insufficient evidence for the undersigned to find otherwise.  Plaintiff's Motion for Summary Judgment (docket nos. 12, 17) should be DENIED, Defendant's Motion for Summary Judgment (docket no. 15) should be GRANTED and the instant Complaint DISMISSED.

## REVIEW OF REPORT AND RECOMMENDATION

Either party to this action may object to and seek review of this Report and Recommendation, but must act within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing objections which raise some issues but fail to raise others with specificity will not preserve all objections that a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to Rule 72.1(d)(2) of the *Local Rules of the United States District Court for the Eastern District of Michigan*, a copy of any objection must be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than five (5) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: February 4, 2011          s/ Mona K. Majzoub
                                 MONA K. MAJZOUB
                                 UNITED STATES MAGISTRATE JUDGE


## PROOF OF SERVICE

I hereby certify that a copy of this Report and Recommendation was served upon Counsel of Record on this date.

Dated: February 4, 2011          s/ Lisa C. Bartlett
                                 Case Manager